IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| SANDRA F. REYNOLDS, | ) | |
| Plaintiff, | ) | Civil Action No. 4:14cv00036 |
| v. | ) | |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | By: Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

**REPORT AND RECOMMENDATION**

Plaintiff Sandra F. Reynolds, proceeding *pro se*, asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–422. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs, and the applicable law, I find that the Commissioner's decision is supported by substantial evidence and should be affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an claimant is disabled. The ALJ asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. § 404.1520(a); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The claimant bears the burden of proof at steps one through four.

2

Case 4:14-cv-00036-JLK-JCH   Document 19   Filed 04/01/15   Page 2 of 18   Pageid#: 384

*Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Reynolds filed for DIB on May 17, 2011. *See* Administrative Record ("R.") 47. She was 46 years old, *id.*, and had worked most recently as a retail logistics supervisor, R. 155. Reynolds alleged disability beginning August 17, 2009, because of headaches and depression; bowel, bladder, and menstrual disorders; sleep apnea; degenerative disc disease; residual pain after back surgery; and leg pain. R. 150, 154. The state agency twice denied her application. R. 46, 56. Reynolds appeared *pro se* at a hearing before ALJ Marc Mates on April 10, 2013. R. 23. She and her husband Donald Reynolds testified as to some of Reynolds's impairments and the limitations those impairments caused in her daily activities. *See* R. 28–36, 42–44. A vocational expert ("VE") also testified as to Reynolds's ability to return to her past work or to perform other work existing in the economy. *See* R. 39–42.

ALJ Mates denied Reynolds's application in a written decision dated June 20, 2013. *See* R. 10–16. He found that she suffered from severe degenerative disc disease status-post surgical fusion, R. 10, but that the impairment did not meet or equal a listing under the regulations, R. 10–11. ALJ Mates also found that Reynolds's other conditions were non-severe impairments because they "ha[d] not required significant treatment or treatment by appropriate specialists, lasted 12 continuous months, or imposed more than minimal limitations on her abilities to perform basic work-related activities." R. 10.

3

ALJ Mates next determined that Reynolds had the residual functional capacity ("RFC") to perform "less than a full range of sedentary work."[1] R. 11. Specifically, he found that she could occasionally lift ten pounds, frequently lift less than ten pounds, stand and walk with a cane for about two hours, sit for about six hours in an eight-hour workday, never kneel or crawl, and occasionally perform "other postural activities, such as balancing and stooping." *Id.* ALJ Mates noted that this RFC ruled out Reynolds's return to her past work as a retail logistics supervisor or assistant manager. R. 15. Finally, relying on the VE's testimony, ALJ Mates concluded that Reynolds was not disabled after August 17, 2009, because she still could perform other jobs available nationally and in Virginia, such as addresser and order clerk. R. 16. The Appeals Council declined to review that decision, R. 1, and this appeal followed.

### III. Discussion

Reynolds's filings, liberally construed, present four reasons "why the Commissioner's decision is not supported by substantial evidence or why the decision otherwise should be reversed or the case remanded," W.D. Va. Gen. R. 4(c)(1). *See generally* Pl. Br. 1–3, ECF No. 14; Pl. Resp. 1–2, ECF No. 17. First, Reynolds asserts that ALJ Mates did not adequately develop the record before making his decision. *See* Pl. Br. 1. Second, Reynolds asserts that she is now receiving specialized treatment for some of the conditions that ALJ Mates discussed in his written decision. *See id.* Third, she argues that substantial evidence does not support ALJ

---

[1] "RFC" is a claimant's maximum ability to work "on a regular and continuing basis" despite her impairments. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the claimant's record and must reflect the "total limiting effects" of the claimant's impairments. 20 C.F.R. § 404.1545. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). A person who can meet those lifting requirements can perform a full range of sedentary work if she also can stand and walk for up to two hours and sit for about six hours in a normal eight-hour workday. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002) (Kiser, J.).

Mates's RFC finding, at least in part because ALJ Mates should have credited her subjective description of her pain and functional limitations. *See generally id.* at 1–3; Pl. Resp. 1–2. Finally, Reynolds argues that the Commissioner did not carry her burden at step five because the VE testified that Reynolds cannot work. *See* Pl. Br. 3; Pl. Resp. 1–2.

A.     *ALJ's Duty to Develop the Record*

Reynolds first asserts that hospital and ambulance records from her admission to the emergency department in Danville on August 23, 2009, were not included in the packet that she received before her April 2013 hearing and that these missing records have "some bearing on [her] case." Pl. Br. 1. ALJs have "a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record[; they] cannot rely only on the evidence submitted by the claimant when that evidence is inadequate."[2] *Thomas v. Comm'r of Soc. Sec.*, No. 4:10cv15, 2011 WL 867092, at *4 (W.D. Va. Mar. 11, 2011) (Kiser, J.) (quoting *Cook v. Heckler*, 783 F.2d 1168, 1173 (1986)). However, the regulations require only that the "evidence be 'complete' enough to make a determination regarding the nature and severity of the claimed disability, the duration of the disability[,] and the claimant's [RFC]." *Kersey v. Astrue*, 614 F. Supp. 2d 679, 695 (W.D. Va. 2009).

---

[2] The Fourth Circuit has long held that ALJs must "assume a more active role" in helping *pro se* claimants adequately develop their records. *Craig*, 76 F.3d at 591 (citing *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980)). That said, even a *pro se* claimant must provide enough information so that the agency can try to develop a reasonably complete record on the claimant's behalf. *See* 20 C.F.R. § 404.1512(d) (providing that the agency "will make every reasonable effort to help [the claimant] get medical reports from [her] own medical sources"). Reynolds did not list any Danville area hospitalizations or emergency room visits on any of the forms that she submitted to the agency. *See* R. 153–60, 201, 221. Nor did she mention these records when ALJ Mates asked if there was "any other evidence" about her treatment history that was missing from the record. *See* R. 43–44. The agency did request the additional medical records that Reynolds mentioned at her hearing. *See generally* R. 299–315.

Reynolds's administrative record contains several years' worth of medical records documenting her conditions and treatment during the relevant period, three physicians' RFC assessments, and statements from Reynolds and Mr. Reynolds describing her symptoms, activities, and limitations. *See generally* R. 225–74, 249–79, 285–87, 313–14 (medical records); R. 53, 63, 295 (RFC assessments); R. 28–36, 36–37, 42–44, 161–181, 223 (statements). It also contains treatment notes from August 23 and 24, 2009, that reference her admission to the Danville emergency room and document her condition. *See* R. 233, 241–42. This evidence, described more fully in Section C, is sufficient to support an informed decision on Reynolds's disability claim. Thus, the missing records are not grounds to reverse the Commissioner's decision. *Cf. Huddleston v. Astrue*, 826 F. Supp. 2d 942, 959 (S.D. W.Va. 2011) (reversing and remanding where "the ALJ had no medical records, consultative examinations, or medical source statements" from the relevant period and "circumstances point[ed] to the probable existence of probative and necessary evidence" not provided by the claimant).

B.   *New Evidence*

Reynolds next asserts that she obtained health insurance in March 2014 and is now receiving specialized treatment for her back and leg pain, sleep apnea, severe headaches, and Lyme disease, "which may have contributed to some of [her] past symptoms." Pl. Br. 1. Construed liberally, Reynolds's assertion calls into doubt ALJ Mates's findings that these impairments were not as severe as alleged because they did "not require[] . . . treatment by appropriate specialists," R. 10, and there were "significant periods of time" where Reynolds did not seek healthcare or take prescription pain medication, R. 14.

In some cases, courts can order the Commissioner to consider additional evidence that was not incorporated into the record while the case was still before the agency. *See* 42 U.S.C. §

6

405(g) (sentence six). Under sentence six, the claimant must provide "at least a general showing of the nature" of her additional evidence so the court can determine whether the evidence is new, material, and related to the period on or before the date of the ALJ's decision. *Owens v. Astrue*, No. 7:09cv263, 2010 WL 3743647, at *4 (W.D. Va. Sept. 22, 2010) (citing *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985)). The court also must determine whether there is a good reason that the additional evidence was not incorporated into the record in an earlier proceeding. *See* 42 U.S.C. § 405(g). I cannot make those findings in this case because Reynolds did not submit any additional evidence to the Appeals Council or to this Court. *See generally* R. 1–3; Pl. Br. 1–4; Pl. Ex. 1–8, ECF. No. 14-1; Pl. Resp. 1–2. Her vague assertion that new, possibly material evidence exists is not enough to authorize a sentence-six remand. *See King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979).

C.  *Reynolds's RFC*

Reynolds next argues that substantial evidence does not support ALJ Mates's RFC finding, at least in part because ALJ Mates should have credited her subjective description of her pain and functional limitations. *See* Pl. Br. 3; Pl. Resp. 1–2. A claimant's RFC is the most she can do on a regular and continuing basis despite her impairments. 20 C.F.R. § 404.1545(a). "It is an administrative assessment made by the Commissioner based on all the relevant evidence in the [claimant's] record," including objective medical evidence, medical-source opinions, and the claimant's statements. *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011); *accord* SSR 96-8p, 1996 WL 374184 (July 2, 1996). The RFC must reflect the combined limiting effects of impairments "supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints." *Carter v. Astrue*, No.

7

3:10cv510, 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011), *adopted by* 2011 WL 2693392 (July 11, 2011); *accord* 20 C.F.R. § 404.1545.

The regulations set out a two-step process for evaluating a claimant's complaint that she is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart*, 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. § 404.1529). The ALJ must first determine whether objective medical evidence[3] shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the kind and degree of pain alleged. *See* 20 C.F.R. § 404.1529(a); *Craig*, 76 F.3d at 594–95; *accord* SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). If the claimant clears this threshold, the ALJ then must evaluate the intensity and persistence of the claimant's pain to determine the extent to which it affects her ability to work. SSR 96-7p, at *2; *see also Craig*, 76 F.3d at 595.

The latter analysis often requires the ALJ to determine "the degree to which [the claimant's] statements can be believed and accepted as true." SSR 96-7p, at *2, *4. The ALJ cannot reject the claimant's subjective description of her pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. § 404.1529; *see also Hines v. Barnhart*, 453 F.3d 559, 563–64 (4th Cir. 2006). Rather, he must consider the claimant's statements against all the available evidence in the record. 20 C.F.R. § 404.1529(c). The ALJ also must give specific reasons "grounded in the evidence" for the weight assigned to subjective statements. *Cooke v. Colvin*, No. 4:13cv18, 2014 WL 4567473, at *4 (W.D. Va. Sept. 12, 2014) (Kiser, J.) (citing SSR 96-7p, at *4). A reviewing court will defer to the ALJ's

---

[3] Objective medical evidence is defined by regulation as "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. § 404.1528(b)–(c). "Symptoms" are the claimant's description of his or her physical or mental impairment. *Id.* § 404.1528(a).

credibility determination except in those "exceptional" cases where the determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all. *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

*1. Relevant Evidence*

Reynolds experienced episodic lower back pain and numbness for many years before she stopped working. *See* R. 230, 235. On August 17, 2009, Reynolds underwent a partial spinal fusion and nerve-root decompression to address L5-S1 spondylolisthesis, secondary to a L5 pars interaritcularis defect; bilateral L5-S1 neural foraminal stenosis, secondary to disc protrusion spondylotic overgrowth, and pseudoarthrosis; and left L4-5 lumbar spondylolisthesis and degenerative disc disease. R. 235. She was discharged from the hospital with a walker on August 20, 2009. *See* R. 240. Dr. Robert Nudelman, M.D., prescribed Percocet and instructed Reynolds to return in three weeks for follow-up X-rays. *See id.*

Reynolds went to a Danville emergency room on August 23, 2009, complaining of severe back pain and muscle spasms in both legs. R. 233. A lumbar CT scan revealed that "the right S1 podicle screw ha[d] broken through the anterior vertebral cortex." *Id.* The emergency room staff transferred Reynolds to Moses Cone Health System, where she had undergone surgery, for further care. *See id.* Diagnostic images taken the next day showed fluid pressing on the screws at L4 and L5. *See* R. 241. The reviewing physician noted that this "mass effect" could be the source of Reynolds's residual pain. *See* R. 241–42. It is not clear what treatment Reynolds received while hospitalized or when she was discharged from Moses Cone.

Reynolds returned to Dr. Nudelman's clinic on September 10, 2009. R. 246. Nurse Russell Welch, MSN, NP-C, noted that Reynolds's surgical hardware and bone grafts were

9

healing well. *See id.* He encouraged Reynolds "to keep up her walking," but to be careful "bending, stooping, and squatting," especially while wearing her back brace. *Id.* At her next visit on October 27, 2009, Reynolds reported "doing well" and only taking Advil for pain and inflammation. *See* R. 247. Dr. Nudelman and Nurse Welch opined that Reynolds's spinal fusion "look[ed] great" overall. *Id.* Nurse Welch "encouraged [Reynolds] to limit her bending, stooping, and squatting until" January 2010 "when she [could] begin to pick up her activities somewhat." *Id.* He opined that Reynolds "should not be doing any lifting," but that she could perform "light capacity" work if she needed to find a job before the holidays. *Id.* Nurse Welch instructed Reynolds to return in three months and to call if she had any trouble in the meantime. *See id.*

Reynolds visited her gynecologist on October 30, 2009, for an annual exam. *See* R. 254. She denied joint pain or muscle cramps. *See id.* Reynolds returned to the clinic a few days later for a surgical consult. *See* R. 252. She explained that her "urinary urgency and urge incontinence ha[d] resolved" with back surgery, but that she was still experiencing "daily stress urinary incontinence." *Id.* On exam, Dr. Randolph Neal, M.D., noted that Reynolds had normal strength and tone in both legs. *See* R. 253. She did not report any musculoskeletal symptoms on this visit. Reynolds underwent a procedure to address her stress urinary incontinence on November 11, 2009. *See* R. 266.

Reynolds filled out a Pain Questionnaire and Adult Function Report on June 21, 2011. *See* R. 172–81. She reported experiencing constant aching, stabbing, burning, throbbing, and cramping pain in her lower back and both legs since her August 2009 back surgery. R. 172. Reynolds reported that the pain limited her ability to sit, stand, walk, lift, reach, climb, squat, bend, and kneel. R. 179. She estimated that she could sit for "30 minutes tops," stand or walk for

10

up to five minutes, and lift ten pounds. *Id.* Reynolds reported using a cane "to help with [her] balance," but acknowledged that a doctor had not prescribed or recommended the device. R. 180.

The state agency ordered X-rays of Reynolds's lumbar spine before issuing an initial decision on her disability claim. *See* R. 49, 286. Dr. Douglas May, M.D., noted that the films revealed "mild scoliosis," "mild stable anterior subluxation," and the surgical fusion from L5 through S1. R. 51, 286. "No other abnormalities [were] evident" as of July 26, 2011. *Id.* The state agency also arranged for Dr. James Sanderlin, M.D., to examine Reynolds on August 13, 2011. *See* R. 52, 292–96. Reynolds told Dr. Sanderlin that she never fully recovered from her partial spinal fusion. R. 292. She reported back pain similar to "receiving a sledge hammer," as well as shooting pain and cramping in both legs. *Id.*

On exam, Dr. Sanderlin observed that Reynolds walked with a cane and a slow, antalgic gait. *See id.* Reynolds was noticeably unconformable while sitting. *See id.* The ranges of motion in Reynolds's thoracolumbar spine were reduced by about 50 per cent throughout. *See* R. 296. Based on his examination, Dr. Sanderlin opined that Reynolds could occasionally lift ten pounds; frequently lift less than ten pounds; sit for two hours at one time, up to six hours a day; stand and walk with a cane for more than two hours, but less than six hours; and occasionally bend, stoop, crouch, climb, kneel, balance, or crawl. R. 295.

State-agency medical consultant Dr. Wyatt Beazley, M.D., reviewed Reynolds's application on August 23, 2011. R. 47–55. He opined that Reynolds could frequently or occasionally lift ten pounds; sit for about six hours in an eight-hour day, with normal breaks; stand and walk for up to two hours a day; frequently balance, stoop, climb stairs or ramps; and occasionally kneel, crouch, or crawl. R. 53. Dr. Beazley acknowledged that Reynolds experienced "mild" muscle weakness and "significant discomfort in [her] back particularly with

11

movement," but explained that she still could perform "a wide range of seated work." R. 55. State-agency physician Dr. Ralph Hellams, M.D., reconsidered Reynolds's application on October 26, 2011. R. 57–65. He agreed with Dr. Beazley's functional assessment except as to Reynolds's ability to stand and walk during an eight-hour day. *Compare* R. 63, *with* R. 53. Dr. Hellams opined that Reynolds could stand and walk for up to four hours, instead of two hours. R. 63.

Reynolds visited a nurse practitioner on August 11, 2012, complaining of a urinary tract infection. *See* R. 313–14. She denied musculoskeletal pain, stiffness, or swelling. R. 313. On exam, Nurse Linda Morill noted that Reynolds had normal range of motion in all joints. R. 314.

On April 10, 2013, Reynolds and her husband testified about her impairments and the limitations those impairments caused in her daily activities. *See* R. 29–38. Reynolds explained that she experienced persistent pain and numbness in her back and legs. R. 29. The pain "feel[s] like somebody stabbing [her] with daggers from the hip down." *Id.* Reynolds estimated that she could sit for fifteen minutes, stand or walk for ten minutes using a cane for balance, and lift "maybe" seven pounds. *See* R. 30–32. She could not squat at all and could not bend at the waist "like a normal person can bend." R. 31. Reynolds also testified that she lies down four or five times during the day for one to two hours each time. *See* R. 33–34.

2. *The ALJ's Findings*

ALJ Mates found that Reynolds's severe degenerative disc disease "could reasonably be expected to cause [her] alleged symptoms," but that her and Mr. Reynolds's statements describing the intensity, persistence, and limiting effects of those symptoms were "credible only

12

to the extent that they [were] consistent with" his RFC determination.[4] R. 12. He gave several reasons for discounting Reynolds's subjective statements, including the nature and frequency of her treatment, the mostly normal findings on physical exams and diagnostic images after her surgery, her healthcare providers' opinions about her functional abilities, and Reynolds's own inconsistent statements about her symptoms. *See* R. 13–15.

ALJ Mates also considered the medical-source opinions in determining Reynolds's RFC. R. 14–15. He gave "partial weight" to Nurse Welch's opinion that Reynolds "should not be doing any lifting" to the extent the restriction was consistent with Nurse Welch's treatment notes and opinion that Reynolds could perform "light capacity" work. R. 14. ALJ Mates also gave "partial weight" to Dr. Beazley's and Dr. Hellams's RFC assessments, which he found to be "consistent with and supported by other evidence [in the] record, including treatment notes and radiographic results." R. 15. He rejected their opinions that Reynolds could ever kneel or crawl in order to "afford [Reynolds] the maximum benefit" given the record as a whole. *Id.*

After weighing all of this evidence, ALJ Mates determined that Reynolds could occasionally lift ten pounds, frequently lift less than ten pounds, stand and walk with a cane for about two hours, sit for about six hours in an eight-hour workday, never kneel or crawl, and occasionally perform "other postural activities, such as balancing and stooping." R. 11.

---

[4] The Fourth Circuit recently acknowledged that this boilerplate language conflicts with the agency's own regulations and "'gets things backwards' by implying 'that ability to work is determined first and is then used to determine the claimant's credibility.'" *Mascio v. Colvin*, --- F.3d ---, 2015 WL 1219530, at *5 (4th Cir. Mar. 18, 2015) (quoting *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)). The ALJ's reliance on this statement is harmless where, as in Reynolds's case, "he properly analyzed [the claimant's] credibility elsewhere" in his written decision. *Id.* at *6.

13

*3.     Analysis*

ALJ Mates's RFC determination is consistent with the law and supported by substantial evidence in the record. *See Mascio*, 2015 WL 1219530, at *2 (explaining that the ALJ must "identify the individual's functional limitations or restrictions[,] assess his or her work-related abilities on a function-by-function basis," and "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence" (quoting SSR 96-8p, at *1, *7)). He considered all of the relevant evidence in the record and included an adequate narrative discussion describing how that evidence supports each restriction in his RFC assessment. *See* R. 12, 14 (Reynolds's statements); R. 12–15 (treatment history, objective medical evidence, examining-source statements, narrative explanation); R. 14–15 (state-agency medical opinions). Those restrictions are supported by Dr. Sanderlin's, Dr. Beazley's, and Dr. Hellams's nearly identical RFC assessments, the consistently unremarkable physical exams and diagnostic studies after Reynolds's back surgery, and Reynolds's June 2011 statement that she could lift ten pounds. *See* R. 53, 63, 295 (RFC assessments); R. 246–47, 253–54, 286, 294, 296, 314 (physical exams, diagnostic images); R. 179 (Reynolds's statement).

ALJ Mates also "provided a comprehensive list of reasons" with supporting cites to the record for discrediting Reynolds's complaints of debilitating pain and functional limitations. *Cooke*, 2014 WL 4567473, at *4. For example, he correctly identified several instances where Reynolds expressly denied, or at least did not report, experiencing any musculoskeletal pain or numbness. R. 14; *see also* R. 246, 247, 253, 254, 313. This inconsistency supports ALJ Mates's finding that Reynolds's symptoms and limitations were not as severe as alleged. *See Bishop*, 583 F. App'x at 67 (substantial evidence supported ALJ's adverse credibility finding where he "cited specific contradictory testimony and evidence . . . and averred that the entire record had been

14

reviewed"); *Sowers v. Colvin*, No. 4:12cv29, 2013 WL 3879682, at *4 (W.D. Va. July 26, 2013) (Kiser, J.) (claimant's inconsistent statements about his symptoms provided substantial support for ALJ's adverse credibility finding).

ALJ Mates also correctly found that none of Reynolds's providers had limited her physical activity beyond the restrictions included in his RFC determination. R. 13–14. Information that a treating or examining source provides about a claimant's symptoms is an important indicator of the intensity, persistence, and limiting effects of symptoms that can be difficult to quantify. 20 C.F.R. § 404.1529(c)(3). Thus, a provider's failure to impose "symptom-related functional limitations and restrictions" can weigh against the claimant's credibility. *Id.*; *accord Hicks v. Colvin*, No. 7:12cv618, 2014 WL 670916, at *6 (W.D. Va. Feb. 20, 2014). Dr. Nudelman and Nurse Welch cautioned Reynolds to limit her lifting and postural activities for several months after her August 2009 back surgery. R. 246, 247. But none of Reynolds's providers instructed her to lie down throughout the day or questioned her ability to sit, stand, or walk. On the contrary, Nurse Welch "encouraged [Reynolds] to keep up her walking and stay out of bed during the day." R. 246. While Nurse Welch recommended that she limit her bending, stooping, and squatting until around January 2010, he nonetheless approved her for "light capacity" work "prior to the holidays." R. 247. Nurse Morrill also encouraged Reynolds to exercise in August 2012. *See* R. 314.

Reynolds does not dispute ALJ Mates's factual findings or point to any evidence in the record that he ignored, overlooked, or misconstrued. She simply disagrees with his choice between conflicting evidence. *See generally* Pl. Br. 1–3; Pl. Resp. 1–2. This Court cannot second-guess that choice where, as here, the ALJ gave specific and legitimate reasons, supported

15

by substantial evidence in the record, for discrediting the claimant's testimony about her pain and functional limitations. *See Bishop*, 583 F. App'x at 67.

D.     *Reynolds's Ability to Work*

Finally, Reynolds argues that the Commissioner did not carry her burden at step five because the VE testified that Reynolds cannot work. *See* Pl. Br. 3; Pl. Resp. 2. Once ALJ Mates found at step four that Reynolds could not perform her past relevant work, R. 15, the burden shifted to the Commissioner to prove that Reynolds could perform other work existing in the economy. *Hancock*, 667 F.3d at 472. A VE's reliable testimony in response to a proper hypothetical question will support the Commissioner's final decision at step five. *See Walls v. Barnhart*, 296 F.3d 287, 292 (4th Cir. 2002). A proper hypothetical question includes the claimant's age, education, work experience, and an adequate description of "what she can and cannot do." *Fisher v. Barnhart*, 181 F. App'x 359, 365 (4th Cir. 2006).

ALJ Mates asked the VE two questions about a hypothetical person matching Reynolds's age, education, and work experience. *See* R. 40–42. First, he asked whether there were any jobs this person could perform if she were

> limited to . . . lifting no more than 10 pounds on occasion, less than 10 pounds frequently, standing and walking . . . about two hours out of eight [and] sitting about six hours . . . [and] could engage in postural activities to include balancing and stooping on an occasional basis, and would need to avoid . . . kneeling, crawling, those kinds of things.

R. 40. According to the VE, this person could perform sedentary occupations including addresser, with 1,200 jobs in Virginia and 65,000 jobs nationally, and order clerk, with about 900 jobs in Virginia and 140,000 jobs nationally. *Id.* ALJ Mates then asked the VE whether this person could still perform those occupations if she "required a cane for ambulation" and an option "to alternate between sitting and standing as needed." R. 41. The VE said that she could and that the job numbers he provided already took the "sit-stand option" into account. *Id.*

16

Second, ALJ Mates asked the VE whether there were any occupations this person could perform if he "fully" credited Reynolds's testimony describing her functional limitations. *Id.* Specifically, he asked the VE to assume that this person

> [could] walk or stand no more than 10 minutes at a time, sit for about 10 to 15 minutes at a time, lift no more than about seven pounds, . . . needs to lie down intermittently throughout the day for an hour or two up to four to five times a day, and experience[s] the symptoms for a combination of her impairments that would interfere with concentration, pace, and task persistence more than two days a month.

R. 41–42. The VE testified that this person could not perform any work available in today's economy. R. 42.

Reynolds correctly points out that the VE testified that she could not work if the ALJ "fully" credited her subjective limitations. *See* Pl. Br. 3; Pl. Resp. 2. ALJ Mates, however, found that Reynolds's statements were credible only to the extent that they were consistent with his RFC determination. R. 12. As explained above, ALJ Mates's credibility determination and RFC assessment are both consistent with the law and supported by specific, substantial evidence in the record. Thus, his reliance on VE testimony in response to a hypothetical question reflecting that RFC finding was also proper.[5] *See Fisher*, 181 F. App'x at 365. Reynolds does not object to the VE's opinion that a person with the RFC that ALJ Mates described could perform these two occupations or to ALJ Mates's finding that these jobs existed in significant numbers nationally and in Virginia. I find that the Commissioner carried her burden at step five and that her final decision is supported by substantial evidence. *See Walls*, 296 F.3d at 292.

---

[5] ALJ Mates did not expressly include a "sit-stand option" in his RFC determination. R. 11. This unchallenged omission, if error, is harmless because the VE took that restriction into account when testifying that Reynolds could work as an order clerk or addresser. *See Kersey*, 614 F. Supp. at 696 ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.").

17

## IV. Conclusion

This Court must affirm the Commissioner's final decision that Reynolds is not disabled if it is consistent with the law and supported by substantial evidence in the record. The Commissioner has met both requirements. Accordingly, I recommend that the Court **DENY** Reynolds's motion for summary judgment, ECF No. 14, **GRANT** the Commissioner's motion for summary judgment, ECF No. 15, and **DISMISS** this case from the docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to the *pro se* Plaintiff at her address of record and to all counsel of record.

ENTER: April 1, 2015

Joel C. Hoppe
United States Magistrate Judge